**OF THE**
**STATE OF DELAWARE**

DAVID HUME, IV
MAGISTRATE IN CHANCERY

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DE 19947

Report:  March 31, 2026
Date Submitted:  February 2, 2026

Christopher B. Chuff, Esq.
Emily L. Wheatley, Esq.
Tyler R. Wilson, Esq.
Troutman Pepper Locke LLP
1313 Market Street
PO Box 1709
Wilmington, DE 19899

Kevin G. Abrams, Esq.
Eliezer Y. Feinstein, Esq.
Nicholas F. Mastria, Esq.
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, DE 19807

Craig S. Waldman
Meredith Karp
Simpson Thacher & Bartlett LLP
425 Lexington Ave.
New York, NY 10017

RE:   *Shareholder Representative Services LLC v. Sphera Solutions, Inc.*
C.A. No. 2025-0174-DH

Dear Counsel:

This letter decision resolves Defendant Sphera Solution, Inc.'s ("Sphera") motion to partially dismiss Plaintiff Shareholder Representative Services ("SRS") complaint bringing counts of fraud and breach of contract.  The Court denies the Motion on the fraud count and grants the Motion on the breach of contract count related to fee-shifting for the reasons articulated below.

## I. FACTUAL BACKGROUND[1]

SupplyShift was a Delaware corporation offering services to enhance companies' supply chain sustainability management and supplier engagement.[2] Defendant Sphera is a Delaware corporation with its principal place of business in Illinois.[3] It provides services focused on environmental, social, and governance (ESG) performance and risk management.

In 2023, SupplyShift sought to grow by partnering with another company whose product line would complement and boost SupplyShift's offerings and customer base.[4] After SupplyShift determined to merge, Sphera became a natural partner due to the compatibilities between the two entities.[5] Sphera saw SupplyShift as an attractive target because a merger would render Sphera the "only complete

---

[1] I draw the following facts from the Plaintiff's Verified Complaint (Docket Item ("D.I.") 1 [hereinafter "Compl."]) and the Merger Agreement ("Merger Agrmt.") attached as Exhibit A thereto. I take all adequately alleged facts as true for the purpose of this Motion to Dismiss. I refer to the parties' briefing as follows: DOB (Opening Brief of Sphera Solutions, Inc. in Support of its Motion to Partially Dismiss Plaintiff's Verified Complaint), PAB (Plaintiff's Answering Brief in Opposition to Defendant's Motion to Dismiss), and DRB (Reply Brief of Sphera Solutions, Inc. in Support of its Motion to Partially Dismiss Plaintiff's Verified Complaint).

[2] Compl. ¶¶ 2, 30.

[3] *Id.* ¶ 31.

[4] *Id.* ¶ 39.

[5] *Id.* ¶¶ 40–41.

ESG end-to-end solution on the market" with opportunities for revenue growth.[6]  In September 2023, both parties signed a non-binding Letter of Intent, setting a closing purchase price of $50 million.[7]  Both parties later agreed to an earnout structure based on SupplyShift's 2024 Annual Recurring Revenue ("ARR").[8]  SupplyShift claims to have entered into this agreement due to a number of Sphera's representations during negotiations.[9]  But for these representations, SupplyShift would not have entered into the merger agreement.[10]  SupplyShift identifies the following representations as inducing it to enter into the Merger Agreement:

(1) Sphera's CEO stated that Sphera would market SupplyShift product offerings to "all [its] 7,000 . . . customers."[11]
(2) Sphera's Head of Corporate Development stated that Sphera would both substantially increase SupplyShift's marketing budget and focus on cross-selling efforts of SupplyShift products to Sphera customers.[12]
(3) Sphera's Head of Corporate Development represented that Sphera already had a "substantial integration plan" that would it implement immediately post-closing.[13]

---

[6] *Id.* ¶ 44.

[7] *Id.* ¶ 45.

[8] *Id.* ¶¶ 9, 46.

[9] *Id.* ¶¶ 46–48.

[10] *Id.* ¶ 54.

[11] *Id.* ¶ 49.

[12] *Id.* ¶ 50.

[13] *Id.*

(4) Sphera's Head of Corporate Development articulated to SupplyShift's CEO that successfully cross-selling Sphera's lowest price offering to only 7.5% of Sphera's extant customer base would increase ARR to more than $10 million.[14]  Moreover, successfully cross-selling SupplyShift's average price-offering to only 3% of Sphera's customers would increase ARR by more than $13 million.  The ARR benchmark for a full earn-out payment was only $8.5 million.[15]

In December 2023, both parties executed the Merger Agreement.[16]  The Merger Agreement provided for total consideration of $52 million divided into three discrete payments.[17]  First, the base purchase price of $24,003,462 paid at closing.[18]  Second, a true-up payment paid post-closing based upon SupplyShift's 2023 ARR, which ultimately totaled $3,910,516.[19]  Third, the earnout payment equal to 3x the amount by which SupplyShift's 2024 ARR exceeds an $8.5 million 2024 Performance Payment Threshold.[20]  The Merger Agreement further provided that if the 2024 Performance Payment met a certain benchmark, then a

---

[14] As noted below, the Earnout Payment threshold was $8.5 million.

[15] *Id.* ¶ 52.

[16] *Id.* ¶ 55.

[17] *Id.* ¶ 59.

[18] *Id.* ¶¶ 59, 61.

[19] *Id.*

[20] *Id.* ¶¶ 59, 62; Merger Agrmt. § 1.16(b)(i).

portion of the sum would be paid to SupplyShift's common stockholders and option holders, which included some of SupplyShift's employees.[21]

The Merger Agreement prohibited Sphera from intentionally undermining the earnout payment. Section 1.16(d) states that while Sphera may make business decisions regarding the SupplyShift line "in any way that [Sphera] deems appropriate," Sphera may "not knowingly and intentionally take . . . any action with the sole intent of avoiding, reducing or preventing the achievement of the [earnout benchmark]."[22] The Merger Agreement determines that Sphera will indemnify SupplyShift's Securityholders and their representatives and hold them harmless from any losses (and attorneys' fees) arising from Sphera's breach of the Merger Agreement.[23]

Nonetheless, Section 1.16(d) of the Merger Agreement provided that (1) contingent payments (including the earnout) were not guaranteed and (2) Sphera had "no obligation to operate [SupplyShift]'s business[] in order to achieve or maximize any amount of the 2023 Performance True Up Payment or 2024 [Earnout] payment."

---

[21] Compl. ¶ 67; Merger Agrmt. § 1.16(b)(i)(B).

[22] Compl. ¶ 68.

[23] *Id.* ¶ 69; Merger Agrmt. § 8.2(g).

The Merger Agreement included an integration clause stating that the Agreement and related appendices, exhibits, schedules, and related agreements constituted the parties' entire agreement.[24]  The integration clause reads in relevant part that the Merger Agreement "supersede[s] all prior agreements and understandings both written and oral, among the parties with respect to the subject matter hereof, and [is] not intended to confer upon any other Person any rights or remedies hereunder . . . ."  The integration clause lacks an explicit anti-reliance clause stipulating that the parties have *not* relied on any extra-contractual representations or promises.[25]

Post-closing, SupplyShift learned that Sphera's pre-closing actions appeared to subvert its promise to cross-sell and implement the integration plan.[26] Sphera finalized its budget for the Supplyshift business line prior to closing, and

---

[24] Merger Agrmt. § 9.4.

[25] While "Delaware law does not require magic words" to constitute an anti-reliance clause, our case law has established two criteria to constitute such a clause. *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 50 (Del. Ch. 2015).  The provision should include (1) the Seller's disclaimer of representations beyond the integrated contract, and (2) the Seller's lack of liability for representations beyond the integrated contract. *See Abry P'rs V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1043 (Del. Ch. 2006); *see generally* Fridrikh V. Shrayber & Morgan J. Hanson, *Anti-Reliance Clauses and Other Contractual Fraud Limitations Under Delaware Law*, 25 WIDENER L. REV. 23, 29 (2019).

[26] Compl. ¶ 71.

the budget would limit, if not, prevent the line from reaching the necessary Performance Goals for Supplyshift to receive the earnout.[27]

SupplyShift contends that Sphera's following actions prevented cross-selling, thereby subverting any possibility of meeting the Performance Goals:

(1) Sphera initially cross-sold to customers in only 1 of Sphera's 12 product families.[28] Later it cross-sold to one other performance line, totaling a mere 17% of its customer base.[29]

(2) Sphera dedicated minimal resources to cross-selling, including no formal training and only devoting part of one employee's time to coordinate cross-selling across the two product lines.[30]

Sphera failed to notify legacy SupplyShift employees of a retention payment they would receive if they remained with Sphera 12 months post-closing.[31] Sphera management failed to inform eligible employees of this. Instead, Sphera's Head of Corporate Development informed eligible employees that any earnout payment they might receive was part of a "phantom pool," and that their stock options were worth "nothing."[32] Internal Sphera management established a directive forbidding

---

[27] *Id.* ¶ 73.

[28] *Id.* ¶ 77.

[29] *Id.* ¶ 78.

[30] *Id.* ¶ 79.

[31] *Id.* ¶ 81; Merger Agrmt. § 1.12(f).

[32] Compl. ¶¶ 82–83.

communication to employees about such bonus or post-earnout payment eligibility.[33] Ultimately, several key legacy employees left Sphera prior to eligibility for this bonus.[34] Sphera failed to replace these key roles.[35]

Sphera depressed SupplyShift's marketing efforts. In lieu of boosting marketing for the SupplyShift product line, Sphera directed sustainability leads (the historic core of SupplyShift's business) away from SupplyShift products to a different Sphera product line.[36] Plaintiffs estimate this loss represented a potential $2 million ARR pipeline.[37] This marketing decision lies at odds with the Sphera CEO's own statements when he praised SupplyShift's ESG tracking and reporting capabilities and recognized the synergies between this line and Sphera's own customer base.[38] Sphera delayed renewal of a licensing agreement, which resulted in losing an additional $1 million in ARR.[39]

---

[33] *Id.* ¶ 87.

[34] *Id.* ¶¶ 88, 90.

[35] *Id.* ¶¶ 90–91.

[36] *Id.* ¶ 93.

[37] *Id.*

[38] *Id.* ¶¶ 94–95.

[39] *Id.* ¶¶ 96–98.

Sphera's negligence toward SupplyShift's product line resulted in a loss of customers and market credibility.[40]  In combination with the lack of marketing efforts and product management, the SupplyShift line failed to perform.[41]  Several last-ditch efforts to integrate Supplyshift products in 2024 never saw full execution.[42]  Ultimately, Sphera never calculated the 2024 ARR figure, having estimated several months after the merger that the SupplyShift product line would not meet the predetermined benchmark.[43]  The only cited ARR figure, $4 million, came during an end-of-quarter conference as part of an earnout progress update.[44]

Shareholder Representative Services ("SRS") brought action for fraud[45] and breach of contract[46] on behalf of SupplyShift against Sphera.  SRS premises its first count, fraud, on two theories.  First, that Sphera knowingly made false post-closing representations of cross-selling to all its customers, providing marketing funds and supporting cross-selling, and implementing an integration plan.[47]  SRS claims that

---

[40] *Id.* ¶ 100.

[41] *Id.* ¶¶ 101–03.

[42] *Id.* ¶ 104.

[43] *Id.* ¶¶ 107–08.

[44] *Id.* ¶ 107.

[45] *Id.* ¶¶ 114–22.

[46] *Id.* ¶¶ 123–33.

[47] *Id.* ¶ 109.

SupplyShift detrimentally relied on these promises in entering into the Merger Agreement.[48] Second, Sphera's failure to disclose its pre-closing budget that undermined the cross-selling and marketing efforts constitutes fraud by omission.[49] SRS claims that Sphera had a duty to disclose its internal budget determination because it conflicted with Sphera's pre-merger representations.[50]

SRS claims that Sphera breached Section 1.16 of the Merger Agreement because Sphera's actions had "the sole purpose and intent of avoiding, reducing, or preventing SupplyShift's achievement of an earnout."[51]

SRS requests the following relief: (1) damages including the maximum earnout of $24,003,463;[52] (2) costs, expenses, and attorneys' fees under the Merger Agreement's indemnification provision in Section 8.2(g); (3) pre- and post-judgment interest; and (4) all other appropriate relief.[53]

---

[48] *Id.*

[49] *Id.* ¶ 110.

[50] *Id.*

[51] *Id.* ¶ 111.

[52] SRS stipulates that the damages will be proven at trial.

[53] *Id.* ¶¶ a.–d.

Defendant filed a motion to dismiss Plaintiff's fraud claim and request for fee-shifting.[54]  While Defendant disputes the breach of contract claim, it is not subject to this motion to dismiss.[55]   I heard oral argument on February 2, 2026, took the matter under advisement, and now issue my ruling.  Defendant's motion to partially dismiss Plaintiff's verified complaint is denied as to the fraud claim and granted as to the fee-shifting claim.

## II.   ANALYSIS

### A.   Plaintiff's fraud count, including the scienter element, is subject to a heightened pleading requirement under Court of Chancery Rule 9(b) and this Court's jurisprudence on promissory fraud.

The standard for a motion to dismiss is well-settled.  Under Court of Chancery Rule 12(b)(6) the complaint must be dismissed where the plaintiff would not be entitled to recovery "under any reasonably conceivable set of circumstances . . . susceptible of proof."  *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs.*, 27 A.3d 531, 535–36 (Del. 2011).  While the Court accepts all well-pleaded allegations as true, *id.*, it is not compelled to "accept conclusory allegations unsupported by specific facts . . . or draw unreasonable inferences in favor of the non-moving party."  *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011),

---

[54] D.I. 8.

[55] DOB, at 10 n.4.

*overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018). The Court need not "accept every strained interpretation of the allegations proposed by the plaintiff." *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

Counts of fraud are subject to particularized pleading requirements under Court of Chancery Rule 9(b): "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Therefore, all elements of a fraud claim excepting scienter must be plead with particularity. *See ABRY P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006).

### 1. Legal Standard for Fraud.

SRS alleges two discrete theories of fraudulent behavior by Sphera, both "traditional" fraud and fraudulent inducement (promissory fraud). A plaintiff must plead the following five elements for both theories:

> (1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. *S'holder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at *9 (Del. Ch. June 7, 2021) (quoting *Great Hill Equity P'rs IV, LP v.*

*SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at \*32 (Del. Ch. Dec. 3, 2018)).

The first element, false representation, encompasses "overt misrepresentation . . . a deliberate concealment of material facts, or else silence in the face of a duty to speak." *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at \*26 (Del. Ch. Apr. 3, 2020) (cleaned up).

At the motion to dismiss stage, under Rule 9(b), the complaint must allege the circumstances surrounding fraud with "particularity." This Court instructs plaintiffs to frame their allegations of fraud with the following details: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations." *ABRY P'rs*, 891 A.2d at 1050; *see In re P3 Health Gp. Hldgs., LLC*, 2022 WL 15035833, at \*3 (Del. Ch. Oct. 26, 2022) (noting that Rule 9(b)'s particularity requirement is "relative."). Particularity, while not scientific, exists where the complaint "informs defendants of the precise transactions at issue, and the fraud alleged to have occurred in those transactions, so as to place defendants on notice of the precise misconduct with which they are charged." *P3 Health Gp.*, 2022 WL 15035833, at \*4 (quoting *Abry*, 891 A.2d at 1050).

"Opinions and statements as to probable future results are not generally fraudulent even though they relate to material matters . . . ." *Esso Standard Oil Co. v. Cunningham*, 114 A.2d 380, 383 (Del. Ch. 1955). Normally, "statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009).

While in a traditional fraud claim the plaintiff may plead intent generally, a claim premised on promissory fraud imposes a more particularized pleading requirement. *See Grunstein*, 2009 WL 4698541, at *13 (A plaintiff "must plead specific facts that lead to a reasonable inference that the promissor had no intention of performing at the time the promise was made.") (internal citations omitted)).

> **a.** **The Court requires greater factual development to determine whether Sphera's unfulfilled promises constitute promissory fraud or mere puffery.**

Sphera contends that its pre-closing communications are not fraud but instead constitute "mere puffery."[56] A party's "optimistic statements praising its own 'skills, experience, and resources' are 'mere puffery and cannot form the basis for a fraud claim." *Trifecta Multimedia Hldgs. Inc. v. WCG Clinical Servs. LLC*, 318

---

[56] DOB, at 11.

A.3d 450, 463 (Del. Ch. 2024) (quoting David A. Hoffman, *The Best Puffery Article Ever*, 91 IOWA L. REV. 101, 103 (2006)). Vague statements of "corporate optimism" are routine in dealmaking and cannot give rise to liability under a theory of fraud. *See Trifecta*, 318 A.3d at 464.

Sphera identifies the following statements as "mere puffery":

(1) Sphera's promise to "cross-sell SupplyShift's product offerings" to all 7,000 of its customers;[57]

(2) Sphera's statement that all its customers would have a need for SupplyCost's products;[58]

(3) Sphera's promise to provide marketing funds and resources to support cross-selling efforts;[59]

(4) Sphera's promise to implement an integration plan to help facilitate cross-selling efforts post-closing.[60]

A forward-looking statement falls outside the mere puffery safe harbor where it is both "sufficiently specific" and "fraudulently conceived." *P3 Health Gp.*, 2022 WL 15035833, at *3 (citing *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 208–09 (Del. Ch. 2006)). If the plaintiff sets forth particularized facts about (1) the circumstances of the promise, (2) inferences that the promise was

---

[57] Compl. ¶ 49.

[58] *Id.*

[59] *Id.* ¶ 50.

[60] *Id.* ¶ 115.

"unsound from [its] inception," and (3) defendant's incentive to mislead, then the allegation should at least survive the pleading stage. *Trenwick*, 906 A.2d at 209; *see also Roma Landmark Theaters, LLC v. Cohen Exhibition Co. LLC*, 2020 WL 5816759, at *13 (Del. Ch. Sep. 30, 2020) ("To state a claim for fraud relating to statements about a company's expected future financial performance, it is necessary to plead contemporaneous fact[s] supporting an inference [defendant] knew its statements were false when made or lacked a good faith belief in their truth.") (internal citations omitted)).

SRS has pleaded with sufficient particularity that several of Sphera's statements exceeded the shelter of mere puffery and comprise false representation. SRS has met its minimal burden. Undoubtedly, several statements in SRS's complaint are no more than optimistic statements customary in the dealmaking context. For example, Sphera's promise that it would cross-sell SupplyShift's product offerings to *all 7,000* of its customers is textbook "corporate optimism." *See Trifecta*, 318 A.3d at 464 (holding that Buyer's statement that seller would benefit from Buyer's "collaboration, coordination and shared relationship across [Buyer's] 4,000+ clients" is mere puffery). Similarly, Sphera's prediction that all its customers would have a need for SupplyShift's products falls within the aegis of "classically vague statements that a commercial party routinely makes during deal-making courtship."

*Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010).

But Sphera's promise to substantially increase its marketing budget and dedicate resources to cross-selling departs mere puffery's safe harbor into more treacherous waters. While this statement taken by itself could be puffery, SRS's pleading meets the standard this Court set forth in *Trenwick*.[61] According to the language of the complaint, when Sphera's Head of Corporate Development made this statement, Sphera had already finalized its budget for the following year that failed to devote adequate resources to support its promise to SupplyShift.[62] Moreover, Sphera had every incentive to mislead SRS. The complaint alleges that Sphera induced SupplyShift to enter the arrangement where a significant portion of the purchase

---

[61] Had SRS not plead circumstances, inferences, and incentives, then Sphera's statement taken alone would closely resemble the statements this Court recognized as mere puffery in *Fortis Advisors LLC v. Johnson & Johnson*. 2024 WL 4048060, at *46 (Del. Ch. Sep. 4, 2024) ("[Buyer] would spend multiples of what [Seller] alone could devote to its technology . . . .") (internal quotations omitted), *rev'd in part and remanded on other grounds*, *Johnson & Johnson v. Fortis Advisors LLC*, 2026 WL 89452 (Del. Jan. 12, 2026).

[62] Compl. ¶ 73; *see* PAB, at 11. At trial, SRS bears the heavy burden of proving that Sphera finalized the budget prior to making its representations and that the parties speaking on behalf of Sphera had actual knowledge of the budget. But taking the complaint's allegation as true for the purpose of this motion, SRS's allegations meet the Rule 9(b) standard for the first prong of the fraud claim.

price was deferred to the true-up and earn-out stages based on Sphera's representation.[63]

> ### b. SRS's complaint meets the heightened pleading requirement for scienter in promissory fraud claims.

Sphera next advances the argument that the allegedly misleading statements are forward-looking and prospective. "The general rule [is] that statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." *Grunstein v. Silva*, 2009 WL 4698541, at *13 (Del. Ch. Dec. 8, 2009) (citing *Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472, at *4 (Del. Super. Apr. 12, 2001)). However, if the plaintiff alleges particularized facts that the promisor had "no intention of performing" when the promise was made, then the plaintiff has advanced a cognizable fraud claim. *Grunstein*, 2009 WL 4698541, at *13 (citing *Berdel, Inc. v. Berman Real Estate Mgmt., Inc.*, 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997)).

As discussed above, the scienter issue comes down to whether SRS has reasonably alleged that Sphera had finalized its budget prior to executing the Merger Agreement, and that such budget set SupplyShift's performance goal "more than $1

---

[63] *See* PAB, at 16.

million lower than the threshold for achieving an earnout."[64] SRS contends that such sequencing of events leads to the reasonable inference that Sphera's operational plans (and promises to such effect) "were false when made."[65]

While Sphera acknowledges that SRS's pleading includes the "who, what, when, where, and how" concerning the promises of future performance,[66] it contends the complaint lacks allegations of "contemporaneous facts" requisite for a promissory fraud claim.[67] Granted, SRS claims that Sphera's post-closing conduct evinces that the pre-closing representations were false. Nonetheless, SRS relies on *Trifecta* where the Court acknowledged that (1) scienter need not be pled with specificity because such a requirement would be unworkable, and (2) a party can plead fraud by alleging facts supporting an inference that "at the time the promise was made the speaker had no intention of performing." 318 A.3d at 464 (quoting

---

[64] DRB, at 7; PAB, at 23; Compl. ¶ 73.

[65] PAB, at 26.

[66] DRB, at 8 (quoting *In re Rockefeller Ctr. Props., Inc. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002)).

[67] DRB, at 8–9 (citing *Knight Broadband LLC v. Knight*, 2022 WL 1788855, at *11 (Del. Super. June 2, 2022) (holding that reliance on post-acquisition events to demonstrate that pre-acquisition promises were knowingly false when made fails the Rule 9(b) heightened pleading standard)).

*Winner Acceptance Corp. v. Return on Cap. Corp.*, 2008 WL 5352063, at *8 (Del.

Ch. Dec. 23, 2008)).

SRS's scienter pleading is sufficient for several reasons. First, SRS alleges

both that (1) Sphera finalized the budget prior to signing the Merger Agreement and

(2) Sphera's actions post-closing support the inference that its directors knew their

promises were false when made. Moreover, as in *Trifecta*, SRS's pleading alleges

Sphera's motive to make the allegedly false promises. In *Trifecta*, the buyer's intent

to achieve liquidity provided sufficient motive. *See* 318 A.3d at 465. Here, Sphera's

desire to apportion purchase costs into a non-guaranteed earnout provision

accomplishes the same. Sphera suggests that that the existence of an Earnout

Payment "is not indicative of fraud" because such a provision is "regularly used

when buyers and sellers disagree about an asset's value."[68]

If SRS had alleged that the presence of the Earnout Payment alone provided

a reasonable inference for fraudulent behavior, then dismissal would be appropriate.

But in *Trifecta* the proffered motive for fraudulent behavior (taking the buyer public)

was similarly not fraudulent *in se*. Furthermore, the concert of (1) Buyer's motive

and (2) Buyer's post-closing actions providing an inference that pre-closing

---

[68] DRB, at 11–12.

representations were knowingly false together permit this Court to make the reasonable inference that Sphera had no intention of performing on its promises. At the pleading stage, Rule 9(b) and this Court's holdings require nothing more.

> **c.   The Merger Agreement's lack of anti-reliance language in the integration clause does not foreclose Plaintiff's claim of justifiable reliance on Sphera's pre-closing statements.**

The reliance prong of a fraud claim requires the plaintiff to "allege facts making it reasonably conceivable that the plaintiff acted based on the material representation or omission." *Trifecta*, 318 A. 3d, at 465. Normally, reliance is not appropriately adjudicated at the motion to dismiss stage. *See Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *23 (Del. Ch. March 9, 2022) ("Under Delaware law, justifiable reliance is measured objectively and is determined as a matter of fact.") (internal citations omitted). Where a fully integrated contract contains an anti-reliance provision, however, resolution on a motion to dismiss is appropriate. *See Trifecta*, 318 A.3d at 465. Thus, the only issue to decide at this juncture is whether the Merger Agreement contains clear anti-reliance language. It does not.

Even though the Merger Agreement contains an integration clause, this alone fails to bar SRS's claims to have justifiably relied on Sphera's pre-closing representations. "To be effective, a contract 'must contain language that when read together can be said to add up to a clear anti-reliance clause by which the plaintiff

has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract.'"  *In re P3 Health Gp. Hldgs, LLC*, 2022 WL 15035833, at *6 (Del. Ch. Oct. 26, 2022) (quoting *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004)).  No "magic words" relieve a party from liability for extracontractual statements, but this Court declines to bar claims of fraud based on "murky integration clauses, or standard integration clauses without explicit anti-reliance representations . . . ."  *Abry*, 891 A.2d at 1059.

Both parties reckon with this Court's *Trifecta* decision and its characterization of prior Chancery decisions.  *Trifecta* denied a motion to dismiss for a fraudulent inducement claim where the Defendant raised an "almost identical"[69] argument that an integration clause even without anti-reliance language "is sufficient to bar a fraud claim based on expressions of future intent or future promises."  318 A.3d at 466 (citing *S'holder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455, at *12 (Del. Ch. June 7, 2021)).  SRS contends that because the integration clause lacks anti-reliance language it cannot bar a fraud claim and that it otherwise justifiably relied on Sphera's representations.  Sphera argues in response that despite no anti-reliance language, SRS has failed to meet its burden of pleading justifiable

---

[69] PAB, at 31.

reliance.  In light of the parties' detailed legal arguments, it is helpful to first delve deeper into the forested thicket of *Trifecta* and its antecedents.

Two decisions written by then-Vice Chancellor Strine approximately two decades ago set the scene: *Kronenberg v. Katz*[70] and *Abry Partners*.  Both involved fraudulent inducement claims where the Defendant contended that an integration clause barred justifiable reliance on extracontractual representations.  In *Kronenberg*, an LLC agreement contained the following integration clause:

> GP 18.1 *Entire Agreement*.  This Agreement, which includes the Exhibits and shall include any Joinders upon execution thereof, constitutes the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior or contemporaneous agreements, understandings, inducement, or conditions, oral or written, express or implied.  872 A.2d at 587.

*Kronenberg* construed the integration clause as "polic[ing] the variance of the agreement by parol evidence," instead of operating as a "bar to fraud claims . . . ." *Id.* at 592.  The clause omits any language about "understandings" or "inducements" missing from the operating agreement, which the Court criticized for its "lack of clarity."  *Id.* at 593.  *Kronenberg* imposes a clarity requirement on any integration clause such that "the contract must contain language that . . . can be said to add up

---

[70] 872 A.2d 568.

to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.* Notably, *Kronenberg* granted summary judgment for the plaintiff where the fraudulent representations were "materially incorrect financial statements, reliance on which caused the plaintiff buyers to overestimate how much the target company was worth." *Black Horse Cap., LP v. Xstelos Hldgs., Inc.*, 2021 WL 2311455, at *25 (Del. Ch. Sep. 30, 2014).

*Kronenberg's* clear-statement tax vitiates public policy principles articulated by our Supreme Court and aligns with the accepted understanding of how standard integration clauses operate. *See Norton v. Poplos*, 443 A.2d 1, 6 (Del. 1982) ("It is clear, however, that a merger clause does not preclude a claim based upon fraudulent misrepresentations."); *see, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 214 cmt. c (2024) ("What appears to be a complete and binding integrated agreement . . . may be voidable for fraud, duress, mistake, or the like, or it may be illegal. Such invalidating causes need not and commonly do not appear on the face of the writing. They are not affected even by a 'merger' clause.").

*Abry* reinforces Delaware's contractarian commitment without compromising *Kronenberg*'s requirement that an integration clause bars fraud claims only where the integration clause contains explicit anti-reliance language. It further recognizes

that the Court should hold sophisticated parties accountable to their bargained-for contract where they disclaim reliance on "information that they . . . agreed did not form a part of the basis for their decision to contract." *Abry*, 891 A.2d at 1057 (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 142 n.18 (Del. Ch. 2003)). Much as *Kronenberg* reinforces a public policy against fraud, *Abry* promotes a public policy of truthfulness:

> The teaching of this court, . . . is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim. The policy basis for this line of cases is, in my view, quite strong. *Abry*, 891 A.2d at 1057.

S*ee id.* at n.55 ("[T]he danger [in not enforcing anti-reliance clauses] is that a contracting party may accept additional compensation for a risk that it has no intention of actually bearing. This prevarication may amount to a fraud all its own . . . the safer route is to leave parties that can protect themselves to their own devices, enforcing the agreement they actually fashion.") (citing *MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 218 (3d Cir. 2005) (applying Delaware law)).

Seeking to balance the Court's reluctance to bar fraud with Delaware's contractarian commitment, *Abry* distinguished between intentional misrepresentations of fact ("a lie"), and an "unintentional misrepresentation of fact"

(error or negligence). 891 A.2d at 1062; *see Black Horse Cap.*, 2021 WL 2311455, at *24 (applying *Abry* and *Kronenberg* to dismiss fraudulent inducement claims where the integration clause contained an anti-reliance provision). *Albertsons* further reifies the lie/negligence distinction:

> [O]ur law is now settled that [t]he presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on *facts* outside the contract, will not suffice to bar fraud claims." 2021 WL 2311455, at *21.

In keeping with precedent, both *Black Horse* and *Albertsons* would impose the anti-reliance requirement where the "extra-contractual fraud claim [was] based on factual misrepresentations . . . ." *Albertsons*, 2021 WL 2311455, at *12.[71]

---

[71] The latter part of this quote reads as follows: an integration clause suffices "to bar a fraud claim based on expressions of future intent or future promises." *Albertsons*, 2021 WL 2311455, at *12. *Trifecta* criticizes this statement as relying on *Abry* "for a proposition that *Abry Partners* rejects." 318 A.3d at 466. The two decisions, however, are not on such different grounds. *Trifecta* rejects any distinction between misrepresentations of fact and fraudulent inducement. *See id.* But *Albertsons* and *Black Horse* simply permitted an integration clause to bar allegations of fraud when the promises in question were pre-signing terms that never "made it into the written contract." *Albertsons*, 2021 WL 2311455, at *12 (citing *Black Horse*, 2014 WL 5025926, at *24)). Under *Trifecta's* logic, such claims just are not fraud in the first place. *See* 318 A.3d at 466–67 (defining factually false representations as a core element of a fraud claim). The terms in *Black Horse* and *Albertsons* were non-final promises rendered in the negotiation context, and those decisions construed the integration clause as to bar parol evidence—the very purpose of an integration clause in the first place.

The factual misrepresentation/negligence distinction proceeds from the nature of fraud itself.  The first element of a fraud claim is an "intentional misrepresentation," and it makes little sense to impose liability for fraud where a buyer makes a representation to the seller about future action without knowing whether such promise will bear out.  *See Abry*, 891 A.2d at 1062 ("A seller can make a misrepresentation of fact because it was misinformed by someone else, was negligent, or even was reckless. . . . The level of self-investigation expected from a seller . . . seems to be a more legitimate subject for bargaining than whether the seller can insulate itself from liability for lies.").

Then-Vice Chancellor Strine's diptych established a clear doctrinal line: when sophisticated parties bargain for anti-reliance language in a contract's integration provision, the provision bars fraudulent inducement claims.  But a lack of clear anti-reliance language permits a plaintiff to adequately plead the reliance prong of a fraud claim.  *Trifecta* reasserts this decades-old distinction: in pleading justifiable reliance on knowingly false promises, "the absence of an anti-reliance clause is therefore dispositive."  318 A.3d at 467.

Thus, my task is simple.  I need only ask whether SRS has pleaded that Sphera made factually false promises, and whether the integration clause contains clear anti-reliance language.  The answer to the first question is yes, and to the second, no.

SRS pleaded with particularity that even though Sphera had established a pre-closing budget that contradicted its promise to cross-sell SupplyShift's products to all 7,000 of its customers while providing "sufficient resources and an integration plan to support those cross-sell efforts." If SRS can demonstrate at trial that (1) Sphera finalized its Pre-Closing budget prior to making this representation, and (2) that the Sphera director who made the representation knew at the time it was false, then Sphera may well succeed in the action. This is a hefty burden, but SRS has adequately pleaded a factual misrepresentation.

Sphera does not contest that the Merger Agreement's integration clause lacks clear anti-reliance language. The Agreement states that it "constitute[s] the entire agreement among the parties . . . with respect to the subject matter hereof and supersede[s] all prior agreements and understandings both written and oral, among the parties with respect to the subject matter hereof." § 9.4. Notably, this evinces no unambiguous intent to "preclude reliance on extra-contractual statements . . . ." *Kronenberg*, 872 A.2d at 593.

Sphera raises a number of compelling arguments in its briefing that despite no anti-reliance language, SRS has not demonstrated justifiable reliance on Sphera's representations. First, Sphera contends that the Merger Agreement's final terms provide "compelling evidence that the alleged misrepresentations underpinning

Plaintiff's fraud claim were intentionally *excluded* from the final contract."[72]  Next, Sphera recognizes that both parties to the merger possessed sophisticated counsel and could have bargained for greater contractual protections.[73]  Sphera urges me to reject SRS's inferences of justifiable reliance given these indicia that SupplyShift directors knew what they bargained for and could have pursued further due diligence.  But while both arguments have merit, they are better adjudicated with a full factual record, and neither rebuts SRS's particularized pleading of justifiable reliance.

> **d.      SRS's alternative theory that Sphera had a duty to disclose the Pre-Closing Budget survives the pleading stage.**

In alternative to the theory that Sphera knew that its pre-closing representations were false, SRS contends that Sphera had a duty to disclose its Pre-Closing Budget.  It is axiomatic at Delaware law that parties to an arms-length transaction have no affirmative duty to disclose material facts.  *See Trusa v. Nepo*, 2017 WL 1379594, at *10 (Del. Ch. Apr. 13, 2017).  Where a party chooses to speak, however, "it cannot lie" and "also cannot [speak] partially or obliquely such that what the party conveys become misleading."  *Id.*

---

[72] DOB, at 23.

[73] *Id.* at 25.

As established above, SRS adequately pleaded that Sphera made a factual representation about its cross-selling efforts when its Pre-Closing Budget was already finalized. To the extent that the Sphera directors making such representations to SupplyShift did not know its representations were false or misleading, it possessed an affirmative duty to disclose. *See NetApp, Inc. v. Cinelli*, 2023 WL 4925910, at *13 (Del. Ch. Aug. 2, 2023) ("A duty to speak can arise before the consummation of a business transaction when a party acquires information that is necessary to prevent [a] partial or ambiguous statement of the facts from being misleading.") (internal citations omitted).

Sphera's arguments to the contrary are unavailing. Sphera argues that any alleged misrepresentations only concerned the future, rather than the present state of affairs. SRS pleaded that Sphera committed to establishing an integration plan that would permit broad cross-selling efforts. It also pleaded that when Sphera made such commitments, Sphera had *already* finalized its budget. It defies reasonable inference that those at Sphera conducting high level acquisition negotiations had no connection to those making equally high-level decisions on the going-forward budget for the new acquisition. While the commitment to broad cross-selling concerns the future, any representations about the Budget related to the present state of affairs.

Additionally, Sphera contends that SupplyShift could have negotiated terms requiring Sphera to operate the acquired business lines in a certain manner yet chose not to do so. But when negotiating, SRS has plausibly alleged that Sphera made commitments that at best were "partial or ambiguous." *NetApp*, 2023 WL 4925910, at *13. It is unreasonable to require a contracting party to bargain for extractions or commitments when it relied on representations it had no reason to doubt. As a result, SRS's duty to disclose argument survives Sphera's Motion to Dismiss.

### 2. Plaintiff's claim that the Section 8.2(g) indemnification clause permits fee-shifting in selling-stockholder initiated litigation is dismissed.

SRS finally contends that Section 8.2(g) of the Merger Agreement obligates Sphera to indemnify it for costs and fees in this action.[74] The American Rule, "provid[ing] that each party is generally expected to pay its own attorneys' fees" normally governs in Delaware. *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017). Even where parties have contractually agreed to indemnification provisions, "Delaware courts do not interpret indemnification provisions in an expansive way that would be inconsistent with the American Rule." *Nasdi Hldgs., LLC v. N. Am.*

---

[74] *See* Compl. ¶ 129.

*Leasing, Inc.*, 2020 WL 1865747, at *5 (Del. Ch. Apr. 13, 2020) (internal citations

omitted).

Section 8.2(g) of the Merger Agreement provides in relevant part:

Acquiror and the Surviving Corporation shall indemnify, defend and
hold harmless the Company Securityholders . . . from and against, and
pay and reimburse each Seller Indemnified Party for, any and all claims,
losses, liabilities, damages, deficiencies, Taxes, costs, interest, awards,
judgments, penalties, fees and expenses, including reasonable fees and
expenses of lawyers, consultants, and other professionals, including any
such reasonable costs, fees, and expenses incurred by the Seller
Indemnified Parties in connection with investigating, defending against
or settling any of the foregoing, and punitive, consequential, or
exemplary damages, solely to the extent that any such punitive,
consequential, or exemplary damages are found by a court of competent
jurisdiction to be owed to an unaffiliated third Person . . . to the extent
directly or indirectly arising out of, resulting from, relating to, or in
connection with any breach of, default in, or Acquiror's or Merger
Sub's failure to comply with any of the covenants or agreements made
by either of them in this Agreement.

Despite the strong presumption that standard indemnification clauses do not

provide for fee shifting, SRS relies on *Schneider Nat'l Carriers, Inc. v. Kuntz* to

bolster its argument. 2022 WL 1222738 (Del. Super. Apr. 25, 2022). *Kuntz*

identified hallmarks of an indemnification clause that denote "clear and unequivocal

articulation of the parties' intent" to cover first-party affirmative claims. *Id.* at *31.

*Kuntz* distinguished its contested indemnification clause from another discussed in

*TranSched Systems Limited v. Versyss Transit Solutions, LLC*, which did not operate

as a fee-shifting provision. 2012 WL 1415466 (Del Super. Mar. 29, 2012). *Kuntz* (and SRS) rely on the following five hallmarks that an indemnification clause gives rise to fee-shifting in first-party litigation: (1) it required indemnification payment for breaches that could not arise from a third-party claim; (2) its definition of "losses" requiring indemnification differentiated between third-party claims and non-third party claims; (3) the notice of claim requirement in the provision contemplated especial rights and obligations for third-party claims, reflecting that it may apply outside of the third-party context; and (4) the relevant agreement did not provide for fee-shifting elsewhere. *Kuntz*, 2022 WL 1222738 at \*30–31. *Kuntz* treated no single hallmark as dispositive and relied on them together to infer the unambiguous intent of the parties. *See id.* at \*31 (summarizing the hallmarks as "principles of contract construction" applied to the provisions as a whole). I do the same here and hold that the indemnification provision does not unambiguously contemplate fee-shifting where the Seller brings a first-party, affirmative claim.

First, the indemnification provision does not apply to any breach of the Merger Agreement's covenants and representations. It requires Sphera to indemnify the following:

> [R]easonable costs, fees, and expenses incurred by the Seller . . . in connection with investigating, defending against or settling [damages] . . . solely to the extent that [such damages] . . . [are] owed to an

unaffiliated third Person . . . to the extent directly or indirectly arising out of, resulting from, relating to, or in connection with any breach of, default in, or Acquiror's or Merger Sub's failure to comply with any of the covenants or agreements made by either of them in this Agreement.[75]

SRS argues that Sphera covenanted to pay SupplyShift stockholders an earnout, and that such covenant could only give rise to a first-party claim.[76] Therefore, because the indemnification clause covers a breach of "the covenants or agreements" made by either party in the Agreement, it is reasonable to infer that indemnification applies here.

Sphera's breach of any covenant or agreement alone fails to trigger the indemnification provision's applicability. The provision clearly contemplates that damages must be owed to an "unaffiliated third Person" for indemnification to apply. Furthermore, the *Kuntz* indemnification provision explicitly contemplated breaches that could only give rise to first-party claims: "[The indemnification provision] does not merely require indemnity for breach of *any* covenant, but expressly include[es] making any Deferred Consideration Payment, or any required Annual Contingent Payment or Annual Contingent True-Up Payment." 2022 WL 1222738 at *30 (internal quotations omitted) (emphasis added). The Merger Agreement's

---

[75] Merger Agrmt. § 8.2(g).

[76] *See* DAB, at 38; Merger Agrmt. § 1.16(b)(i).

indemnification provision lacks the express provisions that *Kuntz* found to be distinguishing in the first place.[77]

Second, unlike in *Kuntz*, the indemnification provision does not distinguish between losses arising from first-party claims and those arising from third-party claims. SRS reads the indemnification provision to cover two distinct categories of losses:

(1) Any and all claims, losses, liabilities, damages, deficiencies, Taxes, costs, interest, awards, judgments, penalties, fees and expenses, including reasonable fees and expenses of lawyers . . . including any such reasonable costs, fees and expenses incurred by the Seller Indemnified Parties in connection with investigating, defending against or settling any of the foregoing;

(2) [*A*]*nd* punitive, consequential, or exemplary damages, solely to the extent that any such punitive, consequential or exemplary damages are found by a court of competent jurisdiction to be *owed to an unaffiliated third Person* . . . .[78]

Under SRS's interpretation, only the second clause, prefaced by the conjunctive "And" limits indemnification to third-party initiated litigation. Furthermore, SRS contends that *Kuntz* supports its construction because the Court held that a comparable distinction supported the application of the indemnification provision to

---

[77] Sphera highlighted that indemnification for breach of an agreement's covenants and representations is standard practice and cannot be construed as an exception to the general rule. *See* DRB, at 19 (citing ABA MERGERS AND ACQS. COMM., *Model Stock Purchase Agreement With Commentary* § 11.4 (2d ed. 2010)). I agree.

[78] DRB, at 38–39 (citing Merger Agrmt., § 8.2 (citation modified) (emphasis added)).

first-party claims, with the exception of enumerated types of damages expressly constrained to the third-party context. *See* 2022 WL 1222738 at *30.

The indemnification provision in *Kuntz* is readily distinguishable than the one before me. In *Kuntz*, the indemnification provision barred recovery for "punitive or exemplary" damages and "not . . . reasonably foreseeable damages" except where such damages were sought in a Third-Party claim. *Id.* Thus, the provision anticipated that indemnification applied in a first party claim *except* where the damages were punitive, exemplary, or not reasonably foreseeable. The indemnification provision applied more broadly in the context of Third-Party claims.

Although SRS attempts to read a comparable distinction here between clauses (1) and (2), not only does no such distinction unambiguously appear in the text, even if I adopted SRS's reading this action would not trigger the indemnification provision. Starting with clause (1), indemnification applies only "in connection with investigating, defending against or settling any of the foregoing," where foregoing applies to "any and all claims, losses, [and] liabilities" in addition to "reasonable costs, fees, and expenses incurred by [SupplyShift stockholders]." As Sphera aptly notes, the SupplyShift stockholders are prosecuting Sphera, not investigating, defending, or settling any claims. Delaware law distinguishes between prosecuting claims and investigating, settling or defending them, and I must read the

indemnification provision in light of such precedent. *See, e.g.*, *Highlands Ins. Gp., Inc. v. Halliburton Co.*, 852 A.2d 1, 9 (Del. Ch. 2003) (holding that an indemnification provision operative "in connection *with investigating or defending* any such Loss or Proceeding . . . can in no way be construed as *investigating or defending* a Loss.") (emphasis in original).

The modifying clause of "investigating, defending against, or settling" applies to all losses. SRS argues that "including," which precedes the modifying clause, denotes no such absolute limitation. But I must read the contractual provision as a whole, and the operative phrase states "in connection with investigating, defending against or settling any of the *foregoing*." Foregoing refers to all costs to which the indemnification provision applies, *i.e.*, claims, losses, liabilities, etc. "Including" expressly incorporates "any such reasonable costs, fees, and expenses incurred by the [SupplyShift stockholders]" and does not expand the indemnification provision beyond "investigating, defending against or settling" claims or losses.

Third, SRS argues that the indemnification provision contemplates both first- and third-party claims. Here, SRS relies on Section 8.5(a), requiring an indemnified party to deliver a signed "claim notice" where the indemnified party "becomes subject to any Action instituted by any third party" in a covered action "or the Indemnified Party otherwise incurs, pays or sustains a liability, and for which

indemnification may reasonably be sought . . . ." This argument, at best, is neutral. Our caselaw establishes the strong presumption that indemnification provisions do not obligate fee-shifting in first-party instituted actions. *See, e.g.*, *Great Hill Eq. P'rs IV, LP v. SIG Growth Eq. Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) ("purely contractual indemnification provisions only shift first-party claims if the contract explicitly so provides . . . ."). Contracting parties may include language that covers unanticipated events, such as fee-shifting that arises outside the typical third-party claim situation contemplated by the indemnification provision itself. The language in the claim notice provision, however, does not unambiguously express an intent to deviate from the American Rule for inter-party litigation fees. *Cf. Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*, 2013 WL 1955012, at *44 (Del. Ch. May 13, 2013) ("[I]ndemnity agreements are presumed *not* to require reimbursement for attorneys' fees incurred as a result of substantive litigation between the parties to the agreement absent a *clear and unequivocal articulation of that intent*.") (internal citations omitted) (emphasis added).

Fourth and finally, SRS points to the Agreement's lack of a fee-shifting clause elsewhere in the Merger Agreement. This is true. Nevertheless, this alone does not compel me to read the indemnification provision as an exception to the American Rule. SRS cites two authorities for its proposition that the lack of a fee-shifting

clause comprises clear intent that the indemnification provision covers first-party claims. SRS's strongest authority is *Menzies v. Seyfarth Shaw LLP*, a District of Delaware decision applying Delaware law. 2024 WL 2804813 (D. Del. May 31, 2024). There, the Court read an indemnification clause as applying to first-party claims for two independent reasons. Most notably, the District Court explained that the Delaware Business Trust Act applied, which permits broader indemnification than in other contexts. *See id.* at *3. In the alternative, the District Court applied the same multi-factor test I do here, identifying three factors as dispositive. *Id.* at *4. First, the provisions "expressly covered acts that would give rise to exclusively first-party claims," unlike here. Second, the agreements lacked a fee-shifting clause. *Id.* And third, the agreements lacked a written-notice provision for indemnification, which our Merger Agreement does not contain, as discussed above. *Id.*; *see* Merger Agrmt. § 8.5(a). The first and third factors are inapposite. As to the second, it is unreasonable to construe the lack of a fee-shifting clause alone as expressing a "clear and unequivocal intent" to deviate from the norm.

SRS fares no better under its second cited authority, *Kuntz*. *Kuntz* interprets the presence of a fee-shifting clause as evidence that "the parties did not intend for Losses to encompass fee-shifting on first-party claims." 2022 WL 1222738, at *31 (citing *Ashland LLC v. Samuel J. Heyman 1981 Continuing Tr. For Heyman*, 2020

WL 6582958, at *7 (Del. Super. Nov. 10, 2020)). But the absence of a fee-shifting clause does not stand for the opposite proposition, as the Merger Agreement itself indicates. Notably, the indemnification provision covering Sphera contemplates indemnification for non-third-party claims, as evidenced by the language "whether or not due to a Third Party Claim" at the end of the provision discussing Acquiror losses.[79] The absence of such language in Section 8.2(g) identifying Sphera's obligation to indemnify SupplyShift stockholders indicates clear intent they are not entitled to indemnification in first-party litigation against Sphera. *See Williams Cos. v. Energy Transfer LP*, 2020 WL 3581095, at *12 n.123 (Del. Ch. July 2, 2020) ("[T]he use of different language in different sections of a contract suggests the difference is intentional—*i.e.*, the parties intended for the sections to have different meanings.").

Section 8.2(g) does not contain unambiguous intent to deviate from the American Rule and obligate Sphera to indemnify SupplyShift stockholders in inter-party litigation initiated by the selling stockholders. Therefore, SRS's claim for breach of contract is dismissed as regards fee-shifting.

---

[79] Merger Agrmt., § 8.2.

## III.   CONCLUSION

For the reasons explained above, I recommend that Count I is not dismissed

and Count II is dismissed.  This is a report pursuant to Court of Chancery Rule 144.

Sincerely,

*/s/ David Hume, IV*

David Hume, IV
Magistrate in Chancery


cc:   All counsel of record (by File & ServeXpress)